PEOPLE v BOTTANY

1. CRIMINAL LAW—EVIDENCE—IDENTITY—ELEMENTS OF PROOF.

Identity of a defendant as the person who committed a crime may be established beyond a reasonable doubt by segments of circumstantial proof in combination, although each element standing alone is not sufficient.

2. CRIMINAL LAW—IDENTITY—CIRCUMSTANTIAL EVIDENCE.

Circumstantial evidence that defendant matched the general description of a fugitive from a breaking and entering as to clothing, height, and age, and placing him close to the scene of the crime shortly after it was committed, is sufficient to establish his identity as the fugitive.

3. CRIMINAL LAW—ASSISTANCE OF COUNSEL—FAIR TRIAL—MISTAKES.

A defendant was deprived of a fair trial by a series of mistakes committed by his lawyer in allowing introduction of inadmissible hearsay statements of defendant's brother that defendant had been with him in a breaking and entering where the other evidence against defendant, was circumstantial and marginal, and the inadmissible evidence may well have been decisive.

4. CRIMINAL LAW—SENTENCING.

A sentencing judge may not take into consideration defendant's refusal to plead guilty in determining the term of the sentence.

Appeal from Recorder's Court of Detroit, Joseph A. Gillis, J. Submitted Division 1 June 9, 1972, at Detroit. (Docket No. 12201.) Decided October 25, 1972.

Arthur L. Bottany was convicted of breaking

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 30 Am Jur 2d, Evidence §§ 1091, 1125, 1126.
[3] 21 Am Jur 2d, Criminal Law §§ 97, 315.
  Incompetency of counsel chosen by accused as affecting validity of conviction, 74 ALR2d 1390.
[4] 21 Am Jur 2d, Criminal Law §§ 525–530, 533.

and entering with intent to commit larceny in a building. Defendant appeals. Reversed and remanded for new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Edward R. Wilson,* Assistant Prosecuting Attorney, for the people.

*Gerald S. Surowiec,* for defendant on appeal.

Before: DANHOF, P. J., and LEVIN and BORRADAILE,\* JJ.

LEVIN, J. Defendant, Arthur Lee Bottany, was convicted by a jury of breaking and entering with intent to commit larceny,[1] and larceny in a building.[2] We reverse, holding that errors of his counsel deprived him of a fair trial.

At approximately 2:20 a.m., December 25, 1970, two Detroit police officers noticed a man standing by a window outside of Pete's Tavern. As they approached, he fled and eluded them. A second man, however, was apprehended as he emerged through the window. That man was intoxicated and was carrying several bottles of liquor. He proved to be John Bottany, the defendant's brother.

The officers broadcast a description of the man who had escaped. He was described as a Negro male in his twenties wearing a green army field jacket and dark trousers. The description may also

---

\* Probate judge, sitting on the Court of Appeals by assignment.

[1] MCLA 750.110; MSA 28.305.

[2] MCLA 750.360; MSA 28.592.

have included the fact that the fugitive was approximately six feet tall.[3]

The defendant was seen within a matter of minutes by other officers about three blocks away from Pete's Tavern. He was walking in the direction in which the suspect had fled. He was dressed in a green army field jacket and dark trousers. He was 20 years old and 5' 11" tall. He was also, it later appeared, the brother of the man who had been apprehended at the scene.

## I

The defendant contends that the evidence is insufficient as a matter of law to sustain his conviction.

It is true that the evidence against the defendant is entirely circumstantial, and far from compelling. Green jackets such as the one worn by the defendant are not uncommon. The defendant was near the scene of the crime, but he was nearer to his own home—he said he was only 50 yards from his home when he was arrested. The familial relationship proves nothing by itself.

Nevertheless, the people have shown that the defendant matched the general description of the fugitive; he wore the right jacket and trousers, and was the right height and age. Additionally, the people placed the defendant close by the scene of the crime shortly after it was committed.

While either of these segments of proof, standing alone, might not be sufficient to establish an identification beyond a reasonable doubt, in combina-

---

[3] The officer who broadcast the description said that he had not determined the fugitive's height. His partner did not recall whether the radio description had included height. The officer who arrested defendant said that the radio report described the fugitive as six feet tall.

tion they establish the defendant's identity as the fugitive with at least as much certainty as many eyewitness identifications which are regarded as sufficient.[4]

## II

Bottany was, however, deprived of a fair trial by his lawyer's errors. The basis for this holding was set forth in *People v Degraffenreid,* 19 Mich App 702, 715–718 (1969):

"Although the constitution does not guarantee an accused person that his lawyer will not make a big mistake, it does guarantee a fair trial to everyone, whether represented by assigned counsel or by retained counsel. Applying this concept, and in the exercise of their inherent power to control the administration of justice, the courts have granted relief where a substantial right of a defendant in a criminal case was not recognized and protected at trial even though this failure may properly be attributed to the fault of the defendant's lawyer.

"Where the lawyer's mistake is of such serious proportion that it may have been decisive, where but for the lawyer's mistake the defendant might not have been convicted, the court may, despite failure to have preserved the error by timely objection, grant a new trial. * * *

"A claim that a constitutionally adequate lawyer made a serious mistake and that the court should relieve the client of that error focuses our attention on the mistake itself and its significance in bringing about the defendant's conviction.

"In deciding whether to grant a new trial because of a serious mistake a court applies concepts akin to those implicit in the harmless error rule, balancing the public interest in avoiding purposeless retrials against the

---

[4] *Cf. People v Stewart,* 36 Mich App 93, 96 (1971); *People v Johnson,* 33 Mich App 160, 163 (1971); *People v Richard L. Smith,* 15 Mich App 505, 507 (1969).

defendant's interest in having all his rights recognized and asserted. Ordinarily a new trial will not be granted unless it appears that if a new trial is ordered during the conduct of which the mistake is not repeated the defendant may very well be acquitted."

Bottany's lawyer made several serious mistakes, all concerned with the same subject matter. In consequence, there was received in evidence an inadmissible statement attributed to John Bottany, the defendant's brother, to the effect that the defendant was the accomplice who escaped. In the light of the close factual issue presented, this evidence was not harmless—it may well have been decisive.

The following is from the direct examination testimony of one of the officers who made the arrest at Pete's Tavern:

"*Q.* What did you do, sir?
"*A.* I put out the information as far as the other fellow in front of the bar.
"*Q.* What information do you recall that you put out?
"*A.* A Negro male in his twenties with a green field jacket and dark trousers.
"*Q.* Did you put any information out on your radio in regard to what location he would be in?
"*A.* Yes. I also put out it was the same address as John Bottany which lived at 21—I'm sorry—5045—14th Street.
"*Q.* Where did you get that address?
"*A.* From John Bottany."

This last information, to which no objection was offered, was bait, which defense counsel took readily on cross-examination:

"*Q.* Was there any reason why you radioed this particular address?
"*A. From what I understood, John Bottany said that*

*his brother who lived at the same address was with him at the time."* (Emphasis supplied.)

Defendant received a momentary reprieve when this officer's partner testified on direct examination:

"*Q.* Now, what did you do after you talked to John Bottany?

"*A.* I asked him—My partner was giving him his rights. I was pretty well out of breath. After all of this was over with, I asked him who he was with and who I was chasing. He gave me a couple of different names here.

"*The Court:* That would be hearsay."

But even this clue was beyond the ken of defense counsel, for the officer who arrested the defendant testified on direct examination without objection:

"*A.* We were on our way down there, coming south on 14th, and we heard the other officer who testified he was chasing a man north on 14th, and he gave a description of a Negro male, six foot tall, wearing an army type jacket, and it could be the brother of a man they already had in custody as John Bottany."

When John Bottany was called as a defense witness (for no other apparent purpose than to deny that he had made these statements or that he had been accompanied by his brother), he was asked on cross-examination whether he had identified his companion. His denial opened the way for rebuttal testimony by the officer who had arrested him at Pete's Tavern:

"*A.* Well, when he was asked who he was with, he stated—the first name that he gave us was Arthur Edge. He was pretty drunk. We had to ask him several times.

"The second name that he gave us was Arthur Bottany.

"And when he was asked what address they lived at, he stated 5045—14th Street."

Once again damaging testimony was compounded by defense counsel on cross-examination:

"*Q.* What is the address that he gave you—the address that he John Bottany lived at?

"*A.* What we asked him was where this other person lived, and that was the address that he gave.

"*Q.* This other person, is that Arthur Edge?

"*A.* No; Arthur Bottany—it could have been either at the time."

The mistakes of counsel in this case are within the ambit of *Degraffenreid.* There can be no doubt that we are confronted with a mistake, a big mistake. We can conceive of no trial strategy which would explain defense counsel's actions. The testimony concerning the statements of the defendant's brother was inadmissible. It was inadmissible testimony that may well have been decisive. As noted above, the "hard" evidence was weak. The defendant's alibi defense was supported by the testimony of a friend who said he was with the defendant until shortly before his arrest. Even with the damaging inadmissible testimony before it, the jury deliberated for some 4-1/2 hours before arriving at a verdict.

We could not properly say that the mistake was "akin to harmless error". Where evidence is so marginal, it does appear, as defendant's appellate counsel argues, that "if a new trial is ordered during the conduct of which the mistake is not repeated the defendant may very well be acquitted".

### III

At the time the judge accepted John Bottany's plea of guilty, he told Arthur Bottany, the defendant:

*"The Court:* * * * Now, I understand you want a jury trial on ten year maximum and a four year maximum?

"*A.* Yes, sir.

*"The Court:* The philosophy of this court that I follow —

"Let me get that decision.

"The Supreme Court has just handed down a decision in Brady versus United States [397 US 742, 752–753; 90 S Ct 1463, 1471; 25 L Ed 2d 747, 759 (1970)] in regard to guilty pleas.

"The United States Supreme Court indicated—and I will quote exactly from that opinion, and I follow the philosophy of the United States Supreme Court—'Of course, that the prevalence of guilty pleas is explainable does not necessarily validate those pleas or the system which produces them. But we cannot hold that it is unconstitutional for the state to extend a benefit to a defendant who in turn extends a substantial benefit to the state and who demonstrates by his plea that he is ready and willing to admit his crime and to enter the correctional system in a frame of mind that affords hope for success in rehabilitation over a shorter period of time than might otherwise be necessary.'

"In other words, the man who pleads guilty indicates a frame of mind that he owes a debt to society, and it's going to take a very little time to rehabilitate him.

"A man who comes in and demands all his constitutional rights and says he is innocent and denies the crime, if he is found guilty, the United States Supreme Court indicates it may take a longer period of time to rehabilitate him.

"And the court follows that philosophy, too."

That is not an accurate statement of the law of Michigan. In *People v Earegood,* 383 Mich 82, 83,

85 (1970), the defendant appeared before the trial judge at which time a call of the criminal calendar took place. On that occasion, the judge made the following statement:

" 'I think it is about time to make my usual announcement, gentlemen. The purpose of this call is to get pleas. If you are going to plead or waive a trial by jury now is the time to do it, so we can schedule. The Court has a long memory, and all this goes on record, and when it comes time for sentence, if you plead or waive a jury at the last minute, *it is a factor I take into consideration in sentencing.* I am sure you all know the risk.' (Emphasis supplied.)"

Defendant later pled guilty and appealed. The Supreme Court remanded for resentencing, saying:

"[I]t is impermissible for a judge in imposing sentence to take into consideration as a factor in determining the term of the sentence the fact that the defendant pled or waived a jury at the last minute".

In *People v Snow,* 386 Mich 586, 592 (1972), which followed *Earegood,* the "essential issue", as stated by the Michigan Supreme Court, was:

"Is the sentence of a trial court illegal if it was made harsher as a result of appellant's exercising his constitutional right to trial by jury and right not to plead guilty?"

The Court replied affirmatively and once again remanded for resentencing.

The law in other jurisdictions is in accord.[5] In *Scott v United States,* 135 US App DC 377, 380; 419 F2d 264, 267 (1969), the sentencing judge stated that he did not believe the defendant, Scott, that he believed that Scott had deliberately lied

[5] *Cf. People v Zachery Davis,* 41 Mich App 683 (1972).

and if Scott had pled guilty he might have been more lenient. Later the judge said, "I hope sometime I hear some defendant say, 'Judge, I am sorry, I am sorry for what I did'. That is what I have in mind." The Court of Appeals for the District of Columbia Circuit reversed, saying that Scott's refusal to admit his guilt and to show remorse was not a factor which the judge could properly take into consideration in imposing sentence.

The *Scott* Court referred to an earlier opinion of the United States Court of Appeals for the Fifth Circuit, *Thomas v United States,* 368 F2d 941, 946 (CA 5, 1966), where the sentencing judge stated that if the defendant would "come clean and make a clean breast of this thing for once and for all, the Court will take that into account in the length of sentence to be imposed." The defendant persisted in protesting his innocence and was sentenced to serve a term of 25 years. In reversing, the Fifth Circuit declared:

"When Thomas received harsher punishment than the court would have decreed had he waived his Fifth Amendment rights, he paid a judicially imposed penalty for exercising his constitutionally guaranteed rights."[6]

---

[6] The District of Columbia Circuit, in adopting the reasoning of the Fifth Circuit, said that *Scott* (p 268) "could reasonably have believed that he could show penitence—real or affected—only at the price of prejudicing his appeal, if not worse. Whether the trial judge intended or not 'to bargain thus with the defendant' we conclude that 'the court was without right * * * to put a price on an appeal.'"

Similarly, see *O'Hara v People,* 41 Mich 623, 624 (1879), where the Michigan Supreme Court said:

"When a convicted person is brought up for sentence he has rights still, and it is specially incumbent on the judge to take care that they are fully observed and protected. No sort of pressure can be permitted to bring the party to forego any right or advantage however slight. The law will not suffer the least weight to be put in the scale against him, and any attempt cannot fail to be reprobated. Standing at the bar to receive judgment the law surrounds him with its protecting principles and intends that his sentence shall be the reflection of its justice and as far as possible free from all taint of human frailty."

Judge Leventhal, in a perspicuous concurring opinion in *Scott,* took an intermediate view (p 282):

"It is not easy for me to define why I concur in a judgment of remand. There is a natural, and I believe sound, disposition to adjust sanctions when an offender admits his responsibility. This blends in with a readiness to accept the conclusion that such a person has the stuff that portends future improvement. I dare say that many judges, possibly the overwhelming majority, respond in this way, and I am not ready, at least as of this writing, to say that their approach is inadmissible. The wellsprings of human experience are known to every parent concerned with bringing up children, and who has invoked, consciously or not, Parson Weems' account of George Washington and the cherry tree.

"What we have before us is the difference of degree that amounts to a difference in kind. There is a line between responding favorably to an individual's sincere expression of remorse, and reacting in a hostile way because of a personal belief in the guilt of one who maintains his innocence and seeks review of the judgment."

Should the defendant be convicted once again on retrial, the sentencing judge may not take into consideration the fact that the defendant chose to exercise his right to a jury trial.

Reversed and remanded for a new trial.

Danhof and Borradaile, JJ., concurred in the result.

---

The *Scott* Court also rejected the argument that the judge could impose additional punishment because the defendant had committed perjury, saying that if the government wished to prosecute Scott for the independent substantive offense of perjury it could do so and that in such a proceeding he would be entitled to all the protections of a criminal trial. Similarly, see *People v White,* 130 Ill App 2d 775; 267 NE2d 129 (1971), where the sentencing judge stated that the matter was "more aggravated by the circumstances of perjury and so forth". In remanding for resentencing the Illinois appellate court declared that a sentencing judge may not take into consideration his belief that the defendant perjured himself when he testified at his trial because the defendant is entitled to a trial for perjury before he can properly be punished for committing that offense.